312 F.2d 360
 S. Curtis DEMPSEY and Alice E. Dempsey, Appellants in 13,868, Appellees in 13,869,
v.
Charles W. STAUFFER and Violet M. Stauffer, James E. Lawrence and Ruth B. Lawrence, Appellees in 13,868, Appellants in 13,869.
 No. 13868.
 No. 13869.
 United States Court of Appeals Third Circuit.
 Argued October 4, 1962.
 Decided November 28, 1962.
 Rehearing Denied February 20, 1963.
 
 1
 Sam Ferguson Musser, Lancaster, Pa., (Rohrer & Musser, Lancaster, Pa., on the brief), for S. Curtis Dempsey and Alice M. Dempsey.
 
 
 2
 Mark D. Alspach, Philadelphia, Pa., (Krusen Evans & Byrne, Philadelphia, Pa., on the brief), for Charles W. Stauffer, and Violet M. Stauffer.
 
 
 3
 Before STALEY and FORMAN, Circuit Judges, and LANE, District Judge.
 
 
 4
 LANE, District Judge.
 
 
 5
 This is an action for breach of contract brought by plaintiffs, S. Curtis Dempsey and Alice E. Dempsey (appellants in No. 13,868) against defendants, Charles W. Stauffer and Violet M. Stauffer (appellants in No. 13,869) and James E. Lawrence and Ruth B. Lawrence. The jurisdictional requisite of diversity is present and the law of Pennsylvania is applicable.
 
 
 6
 The issues before this court pertain to the determination of the District Court that (1) there was a bad faith breach of contract for which (2) plaintiffs are entitled to recoup principal installment payments made prior to breach, and (3) additional damages relating to loss of bargain, except that (4) plaintiffs failed to prove fair market value of the property involved. The opinions of the District Court are reported at 182 F.Supp. 806 and 197 F.Supp. 260.
 
 
 7
 The material facts may be briefly summarized. On October 9, 1956, Charles W. Stauffer and wife contracted to sell to S. Curtis Dempsey and wife a diner property located in Lancaster, Pennsylvania. They agreed the Dempseys were to pay the sum of $59,000.00 in weekly installments of $113.46 each, together with interest on the unpaid balance of 5% per annum. Purchasers were also to pay all taxes and sewer and water rents. Further, it was provided that title to the premises remained with the sellers until such time as the purchase price, interest, and other payments due had been paid in full. At that time sellers were to deliver to buyers a special warranty deed. The buyers had the right to anticipate any and all payments.
 
 
 8
 As of November 14, 1957, the Dempseys had paid as due the weekly installments of principal ($6,467.22) and interest ($3,059.40) but had not paid any of the taxes or water rent levied on the premises for the year 1957 ($754.34), although the latter were overdue. On that date, without prior notice to the Dempseys, the Stauffers executed an affidavit of default based upon the nonpayment of taxes and water rent and contracted to sell the diner to a third party, the Lawrences, for the sum of $66,000.00. This second contract of sale had been the subject of negotiations over a period of several months and, except for names, dates, and amounts, contained terms identical to the Dempsey contract. The Stauffers then caused to have served upon a Dempsey employee at the diner a copy of the affidavit of default and a letter which read, in part:
 
 
 9
 "This is to further advise you that your rights under this agreement have been terminated and you are to remove, personally, from 823 S. Prince Street, Lancaster, Pennsylvania, forthwith. And you are further notified that none of the personal property at said 823 S. Prince Street is to be touched or moved by you."
 
 
 10
 The Lawrences thereupon took possession of the premises and have since conducted the operation of the diner.
 
 
 11
 The District Court concluded that, by their acceptance of the weekly payments of principal and interest, the Stauffers clearly recognized the contract with the Dempseys was in full force and effect and, therefore, the sellers could not terminate the contract without demand on the Dempseys for performance.[1] Accordingly, the court ruled that the Stauffers are liable for damages resulting from the breach of contract.
 
 
 12
 The Pennsylvania courts have repeatedly held that, in a contract where time is not of the essence, "[w]here time for the performance of a contract is extended from time to time, with no intention manifested to hold to literal performance, a party cannot rescind without a demand for strict performance within a reasonable time." Riddle Co. v. Taubel, 277 Pa. 95, 96, 120 A. 776, 777 (1923). See also Warren Tank Car Co. v. Dodson, 330 Pa. 281, 199 A. 139 (1938); Atlantic City Tire & Rubber Corp. v. Southwark Foundry & Machine Co., 289 Pa. 569, 137 A. 807 (1927); Hopp v. Bergdoll, 285 Pa. 112, 131 A. 698 (1926); C. Trevor Dunham, Inc. v. Nemitz, 82 Pa.Super. 382 (1923); Kuhn v. Skelley, 25 Pa. Super. 185 (1904).
 
 
 13
 The Stauffers contend that Paragraph 15[2] of their contract is sufficient either to make time of the essence or to require strict compliance on the part of the plaintiffs. The Supreme Court of Pennsylvania in considering a similar clause in Warren Tank Car Co. v. Dodson, supra,[3] stated:
 
 
 14
 "From the strict legal standpoint the creditor is entitled to enforce the forfeiture according to the terms of the contract, but equity, or a court administering equitable principles under legal forms, will not permit him to do so if by lulling the debtor into a false sense of security he has led him into a default which otherwise the debtor might have avoided. Being an equitable doctrine, it is limited by the conditions which equity imposes upon those who seek its relief, and among such conditions the most familiar — and the oldest in the history of equity jurisprudence — is the requirement that he who seeks equity must do equity. Prior indulgence by the creditor does not give the debtor an automatic right to an extension, but merely a reasonable opportunity to perform, provided he can show that additional time would enable him to do so." 330 Pa. at 286-287, 199 A. at 142. (Italics in original state reporter.)
 
 
 15
 At no time were the Dempseys in default in payments to be made to the Stauffers. The latter had lost nothing by the acts of which they complained. By not insisting that the Dempseys pay the taxes and water rents when due, they lulled the Dempseys into a false sense of security.
 
 
 16
 "While the lessor had a right to insist on strict performance, he was equally at liberty to permit a variance; and if in doing so over a considerable period, he put the lessee off his guard, it would be inequitable that he insist on exact performance without notice to the * * * [plaintiff] of his intention to require such performance in the future. The inequitableness of such action would be more evident where, as in this case, each payment increased the value of the * * * [plaintiff's] interest in the property and diminished the interest retained by the lessor." C. Trevor Dunham, Inc. v. Nemitz, supra, 82 Pa.Super. at 384.
 
 
 17
 The determination of the District Court that the proofs establish a bad faith breach of contracts, is to be upheld unless the record discloses the finding to be clearly erroneous. Federal Rules of Civil Procedure, rule 52(a). United States v. Ivy Hall Apartments, Inc., 310 F.2d 5 (3d Cir., 1962). We find no such error.
 
 
 18
 We do, however, find error in the conclusion of the court below that the plaintiffs failed to prove the fair market value of the property. We determine the Dempseys are not only entitled to recoup the principal sums paid on the contract prior to November 14, 1957, but are also entitled to an additional item of damages flowing from the loss of their contract bargain.[4] This additional item is represented by the difference between the first contract price ($59,000) and the price established by contract on November 14, 1957 ($66,000), or $7,000.
 
 
 19
 "[W]here the vendor is guilty of collusion, tort, artifice, fraud, or does acts not in good faith to escape from a bad bargain, the vendee is entitled not only to a return of money paid and expenses, but damages arising from the loss of his bargain or the money he might have derived from its completion. This is the bad-faith rule." Seidlek v. Bradley, 293 Pa. 379, 382-383, 142 A. 914, 915, 68 A.L.R. 134 (1928).
 
 
 20
 See also Frey v. Nakles, 380 Pa. 616, 112 A.2d 329 (1955) (dictum); Bartram v. Hering, 18 Pa.Super. 395 (1901) (dictum).
 
 
 21
 The defendants assert that the bargain which plaintiffs had was not a bargain for the conveyance of real estate at or about the time of the alleged breach. They contend that the time for conveyance was almost nine years away and the plaintiff never attempted to establish the value of a bargain to convey nine years in futuro. At worst, they argue, there was an anticipatory breach of contract. For this they cite Restatement, Contracts, § 338 (1932) and Williston, Contracts, § 1397 (1936).
 
 
 22
 Not so. Anticipatory breach of contract was not here involved because plaintiffs were not only entitled to present use and occupancy but were also entitled, by virtue of the acceleration clause contained in the contract, to demand immediate conveyance of title upon tendering the balance of the purchase price.
 
 
 23
 The Lawrence contract was entered into on the same day as the breach of the contract with the Dempseys was effected and was identical except for names, dates, and amounts. However, the court below held that the Lawrence contract "is not competent evidence on the issue of fair market value" citing Henry, Pennsylvania Evidence, § 48:
 
 
 24
 "But evidence of the price paid for particular pieces of land in the vicinity is not competent evidence of value, even on cross examination, since such price may not represent the intrinsic worth of the land or the general public estimate, which is the criterion of value, but may have been paid as the result of fancy or caprice of the purchaser, and to admit the evidence would necessitate the admission of evidence in rebuttal concerning such particular tracts in order to determine whether or not the price received fairly represented the value of the property, thus introducing in evidence as many collateral issues as there are tracts."
 
 
 25
 We do not consider this reasoning applicable where the evidence concerns the identical tract. Evidence to be offered in rebuttal would not constitute proof pertaining to collateral issue but rather would go to the heart of the matter, — the value of the property in controversy. See Walnut Street Federal Savings & Loan Ass'n v. Bernstein, 394 Pa. 353, 147 A.2d 359 (1959) (dictum).
 
 
 26
 An owner of property condemned may be asked the price at which he offered to sell, if the purchase or sale is not too remote. Berger v. Public Parking Authority of Pittsburgh, 380 Pa. 19, 109 A.2d 709 (1954). An offer received by the owner has evidential value. Union National Bank of Pittsburgh v. Crump, 349 Pa. 339, 37 A.2d 733 (1944). But see United States v. Certain Parcels of Land in City of Philadelphia, 144 F.2d 626 (3d Cir., 1944) (dictum). An offer to sell land is admissible if it is an admission against interest. Kaufman v. Pittsburg, C. & W. R. R. Co., 210 Pa. 440, 60 A. 2 (1904); Houston v. Western Washington R. R. Co., 204 Pa. 321, 54 A. 166 (1903); Royal Batting & Felting Co. v. Klein, 149 Pa.Super. 622, 27 A.2d 539 (1942). While the price received in a forced sale has been held inadmissible, Hickey's Appeal, 326 Pa. 467, 192 A. 923 (1937), the courts have allowed evidence of price received in public sales, where it is a sale to a willing buyer, by one not forced to sell. Kaemmerling's Appeal, 282 Pa. 78, 127 A. 439 (1925); Sailer's Appeal, 120 Pa.Super. 69, 181 A. 854 (1935).
 
 
 27
 We find in the present circumstances the sale to the Lawrences on November 14, 1957, meets "the best test recognized of market value." Sailer's Appeal, supra. This is particularly so, since the sale and the breach of contract occurred on the same date.
 
 
 28
 "Ordinarily, by `fair market value' is meant the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." In re Lehigh & Wilkes-Barre Coal Co.'s Assessment, 298 Pa. 294, 300, 148 A. 301, 303 (1929).
 
 
 29
 Again, in Union National Bank of Pittsburgh v. Crump, supra, it is stated:
 
 
 30
 "Many elements properly enter into the determination of `fair market value'. Among these are recent sales of real estate of comparable location and description * * *. Other factors of value include (1) the uses to which the property is adapted and might reasonably be applied * * *; (2) the demand for the property and similar properties, taking into consideration economic conditions which depress market value in its true sense and detrimentally influence such demand * * *; (3) the income produced by the property, including rents, and (4) generally, all elements which affect the actual value of property and therefore influence its fair market value * * *." 349 Pa. at 343, 37 A.2d at 735.
 
 
 31
 On November 14, 1957, the Stauffers were willing sellers and the Lawrences were willing purchasers and neither acted under compulsion. The Stauffers cannot be heard to complain about the acceptance of a fair market value which they helped establish and from which they benefited. They have made a contractual declaration as to value. Indeed, we must presume that plaintiffs themselves could have sold the property on that very day at that very price had they cared to comply with the acceleration provision of their contract.
 
 
 32
 In view of our determination that the fair market value is set out in the Lawrence contract dated November 14, 1957, we deem it unnecessary to review the District Court's ruling as to the probative value of the testimony given by the expert witness called by plaintiffs.
 
 
 33
 Part 1 of the October 16, 1961 judgment of the District Court will be reversed and the cause remanded to the District Court with directions to proceed in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 While there is some testimony that, several months prior to the date of the breach, the Stauffers or their agent asked the plaintiffs about the past due taxes, the court below accepted the plaintiffs' version as the more credible. We cannot find this conclusion was "clearly erroneous." Such need for notice is not obviated by paragraph 18 of the contract, which reads:
 "18. CUMULATIVE REMEDIES — Any remedy of SELLER herein provided for may be pursued by SELLER independently of or in addition to any other remedy herein provided for, and SELLER may pursue any other further remedy at law or in equity, as SELLER may see fit. SELLER'S failure on any occasion to enforce any right or remedy hereunder shall not constitute a waiver of such right or remedy, and the same may be enforced by SELLER at any time."
 
 
 [2]
 "15. TERMINATION ON DEFAULT — If BUYER shall fail to make when due any payment required of BUYER under this agreement, or shall in any other respect commit a breach of this agreement, SELLER may in SELLER'S discretion notify BUYER that this agreement is terminated. In such event all rights of BUYER under this agreement shall be null, void and of no effect, and BUYER shall thereafter have no interest whatever in the premises and SELLER may deal with the premises as though this agreement had not been made; and, if this agreement shall have been recorded, SELLER'S affidavit of default and termination, when similarly recorded, shall be conclusive evidence of SELLER's right to thereafter deal with the premises as though this agreement had never been made. SELLER may in such event nevertheless retain all payments theretofore made by BUYER (except advance payments not yet due under the provisions of Paragraph 2 hereof and against which SELLER shall have no claim arising from BUYER's past or future defaults) and may recover any further payments which shall then be due and unpaid or which shall thereafter become due until BUYER shall vacate the premises, which total sum of payments is hereby agreed shall constitute the liquidated damages for breach of this agreement."
 
 
 [3]
 "The lease provided that, `in the event a default is made in the payment of the rental on the day whereon the same shall become due, then the lessor, its successors or assigns, shall, at its own option, forthwith proceed to take exclusive repossession of the cars hereby leased, and shall by its duly accredited agents, employees or attorneys, make immediate seizure of the said cars wherever found, without notice or process of law, privilege of entry upon the premises of the lessee for the said seizure after default being hereby granted.'" 330 Pa. at 282-83, 199 A. at 140
 
 
 [4]
 The court below allowed the vendors to retain the interest paid. "Interest on the unpaid purchase price ordinarily is the quid pro quo for possession and enjoyment by the purchaser." 197 F.Supp. at 263